IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOHN MCQUAIN,

                    Plaintiff,

v.                                                    Civil Action No. 2:14–CV–97

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On December 17, 2014, the Plaintiff John McQuain ("McQuain" or "Plaintiff") filed this action for judicial review of an adverse decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. ECF No. 1. The Commissioner filed her answer on February 19, 2015. ECF No. 6. The Plaintiff then filed his motion for summary judgment on March 21, 2015. ECF No. 9. The Commissioner filed her motion for summary judgment on May 8, 2015. ECF No. 15. For the reasons that follow, I recommend that Plaintiff's Motion for Summary Judgement be **DENIED** because the Appeals Council's denial of review was not improper and substantial evidence supports the ALJ's findings. Furthermore, I recommend that the Commissioner's Motion for Summary Judgement be **GRANTED** for the reasons set forth.

### II. FACTS

#### A. Procedural History

Plaintiff applied for DIB and SSI benefits alleging a disability beginning on April 16, 2011. R. 15. Plaintiff's claims were initially denied on November 1, 2011, and upon reconsideration on

May 4, 2012. R. 45, 53. On May 24, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 61. An ALJ hearing was held on July 30, 2013, before ALJ Jeffrey P. La Vicka. R. 34. Plaintiff, represented by an attorney, Montie VanNostrand, testified at the hearing, as did a Vocational Expert ("VE"). R. 15. On August 16, 2013, the ALJ found that based on the application for a period of disability of DIB filed on September 28, 2011, Plaintiff is not disabled under the Social Security Act. Plaintiff appealed this decision to the Appeals Council, which denied his request for review on October 28, 2014. R. 7–11. Plaintiff then timely brought his claim to this Court.

**B. Medical History**

The following medical history is relevant to McQuain's challenges to the ALJ's decision.

1. Rosewood Lumber Company injury

McQuain, receiving instruction for learning disabled individuals, graduated high school in 1989. R. 165. Nine years later, while working for the Rosewood Lumber Company, McQuain suffered an injury and subsequently filed a workers' compensation claim. R. 177–80. Dr. Alex Ambroz evaluated McQuain for the claim and opined that he had a chronic cervical strain; thoracic spine strain; post traumatic left shoulder strain; rotator cuff tendinitis; and impingement syndrome, and recommended to the West Virginia Workers' Compensation Office that McQuain receive 15% permanent partial disability, which was later awarded. R. 177.

On January 25, 1999, Dr. Joseph Reed noted that McQuain was okay to return to work, but he advised the following limitations: (1) no use of his left arm, (2) no lifting more than thirty pounds with his right arm and no repetitive lifting, and (3) minimal neck motions. R. 359. Dr. Reed also advised that McQuain should seek a new job that did not require "heavy work." R. 358.

2. Car accident injury and subsequent treatment

On April 18, 2011, McQuain went to Braxton County Memorial Hospital seeking treatment for neck and chest pain that he said resulted from an automobile accident two days prior. R. 184–87. X-rays of McQuain's cervical and thoracic spines taken at the hospital were normal, and he was discharged after a left shoulder sprain diagnosis. *Id.* A week later, on April 25, 2011, McQuain followed up with his primary care physician, Dr. Aimee Whitehair. R. 262. McQuain reported having chest soreness and a stiff neck, but he told Dr. Whitehair that both his neck and chest were improving. *Id.* The following month McQuain told Dr. Whitehair that he was still having neck pain. R. 261. Upon examination, Dr. Whitehair discovered McQuain had decreased range of motion in his neck, and she recommended a cervical MRI. R. 260–61. The cervical MRI completed in June 2011 revealed that McQuain's cervical spine alignment was unremarkable but had degenerative disc disease at all levels, most prominently at C4-C5 and C5-C6. R. 189.

In July of 2011, McQuain went to Dr. Richard A. Douglas. R. 249. Dr. Douglas noted that McQuain claimed "he has never had previous neck or back pain"; however, the doctor also noted that McQuain had a lumbar CT myelogram in 2003 and a cervical spine MRI in 2007. *Id.* After examining McQuain, Dr. Douglas discovered that he had posterior cervical spasm and decreased range of motion with flexion, extension and rotation, but no clonus, a negative Hoffman's test, negative straight leg raising tests bilaterally, full strength in his extremities, and no atrophy. R. 250–51. Based upon the examination, Dr. Douglass ordered multiple diagnostic imaging tests. R. 251.

Dr. Douglas ordered McQuain to Buckhannon Physical Therapy, where he was seen for the next few months. R. 235–43. On September 13, 2011, Dr. Douglas found that the MRI from July

2011 showed "cervical spondylosis at 5-6 and foraminal narrowing probably secondary to a disk herniation in the foramen on the right at 5-6." R. 247. Overall, Dr. Douglas's impression was that McQuain had a cervical and lumbar sprain or strain, degenerative changes, and a right foraminal disk herniation at C5-C6. *Id.* At that time, Dr. Douglas noted that he saw no surgical issues. R. 247–48. Dr. Douglas recommended that McQuain continue physical therapy, and he also referred him to Dr. Corinne Stuart. *Id.*

On November 30, 2011, Dr. Stuart reviewed McQuain's X-rays and examined him. Dr. Stuart assessed McQuain as having chronic cervical pain, left sided cervical facet arthopathy pain syndrome, cervical degenerative disc disease; left cervical radicular pain of unclear distribution (but no clinical signs or symptoms consistent with complex regional pain syndrome), and chronic low back pain with a history of past failure of lumbar epidural steroid injections to provide relief. R. 279. However, Dr. Staurt noted that McQuain's gait was non-antalgic, and his "bilateral upper extremity muscle strength [was] 5/5 in all major proximal and distal muscle groups." *Id.* Regarding a medical treatment plan, Dr. Stuart recommended a cervical facet diagnostic block. R. 280. Citing past experiences, McQuain did not want any injections at that time. *Id.*

On March 30, 2012, Karl Hursey, Ph. D., an agency physician, reviewed McQuain's medical records and determined that he had no medically determinable psychiatric impairment. R. 281. In the consultant's notes, Dr. Hursey indicated that McQuain's Social Security claim was without mental allegations, but Dr. Whitehair indicated there were active anxiety and depression diagnoses. R. 293. Dr. Hursey noted that he followed up with McQuain regarding this issue on March 22, 2012, and McQuain reported that he did not take psychological medication or have any severe mental health problems. *Id.*

Dr. Arturo Sabio reviewed McQuain's medical history and conducted a physical examination in April 2012 on behalf of West Virginia's Disability Determination Service. R. 295. During the physical examination, Dr. Sabio noted that McQuain's gait was antalgic and bent about 15 degrees forward. R. 297. McQuain exhibited tenderness over the spinous process of the cervical and lumbar spine, but Dr. Sabio noted that there was no kyphosis or scoliosis. R. 298. The doctor also noted that range of motion in McQuain's cervical spine and shoulders was limited because he refused to go any further as a result of the pain and stiffness he felt. R. 299. Dr. Sabio also found McQuain had weak handgrip on both sides, but there was no numbness or paresthesia. *Id.* McQuain also could not walk on his heels, toes, or in a heel-to-toe tandem; could not squat; and did not want to stand on either leg by itself because he was afraid of falling. *Id.* The doctor also found that McQuain's deep tendon reflexes and fine manipulation movements were normal. *Id.*

Dr. Fulvio Franyutti, another agency physician, completed the Physical Residual Functional Capacity ("Physical RFC") Assessment on May 2, 2012. R. 300–07. In the assessment, Dr. Franyutti opined that McQuain could lift and/or carry up to ten pounds occasionally; stand and walk for at least two hours in an eight hour workday; and sit for a total of about six hours in an eight hour workday. *Id.* Dr. Franyutti noted that McQuain could occasionally climb ramps and stairs, and he could also occasionally balance, stoop, kneel, crouch, and crawl; however, he never should climb ladders, ropes, or scaffolds. R. 302. Ultimately, Dr. Franyutti felt that McQuain's statements were "vague, but credible," and reduced McQuain's RFC to light due to neck and back pain. R. 305.

On July 12, 2012, McQuain was again seen by Dr. Whitehair, and this time he told the doctor that his legs often feel like they become weak and give out. R. 332. During a physical examination, Dr. Whitehair found that McQuain's distal strength was 5/5 in all extremities. R. 333. Then in

January 2013, McQuain saw Dr. Whitehair for a follow-up visit after he had been diagnosed with a sinus infection. R. 324–25. At this visit, McQuain reported that he did not have to use pain medication often, but "sometimes after works mechanics more will have to use medication." R. 325.

McQuain went to Dr. Whitehair again on March 4, 2013, to follow up on his sinus infection, and he reported "no muscle aches, no muscle weakness, no arthralglas/joint pain, no back pain, and no swelling in the extremities." R. 319–20. Dr. Whitehair also noted that McQuain's gait and station were normal. R. 320.

Eight days later, on March 12, 2013, McQuain went to Dr. Douglas complaining of lumbosacral pain, numbness in his toes, left sided neck pain radiating to down his arm, weakness in his hand grip, and paraethesias in all fingers. R. 339. Dr. Douglas noted that McQuain had not participated in physical therapy or pain management since 2011, but McQuain had modified his activity at home, was only working part time, and had applied for social security disability. *Id.* According to Dr. Douglas, McQuain also tried injections, but with no success. *Id.* Dr. Douglas ordered MRIs of McQuain's cervical spine, thoracic spine, and lumbrosacral spine. R. 341.

The MRIs Dr. Douglas ordered were taken in April 2013. R. 313–17. The cervical spine MRI showed that McQuain had herniated discs at C4-C5, C5-C6, and C6-C7. R. 313. On McQuain's C4-C5, there was moderate to severe central spinal canal stenosis and impingement on the ventral cord, mild exit neuroforaminal narrowing, and nerve root impingement; however, no myelomalacia was identified. *Id.* On his C5-C6, there was moderate central spinal cord stenosis, slight impingement on the ventral cord, and severe right exit neuroforaminal encroachment; but, again, there was no myelomalacia. *Id.* His C6-C7 showed lateral recess narrowing, exit neuroforaminal encroachment, and slight effacement of the thecal sac with mild to moderate neuroforaminal narrowing. R. 314.

McQuain's Lumbar MRI, when compared with the one taken in June 2011, exhibited degenerative disc change, facet arthropathy, and mild central canal narrowing. R. 316–17. McQuain's thoracic MRI was compared to "plain films dated 8/23/2011" and showed mild anterior endplate osteophytes at mid and lower thoracic vertebral levels with no significant stenosis. R. 317.

On April 22, 2013, McQuain was seen by Dr. Douglas, who followed up with the results of the MRIs. *Id.* Dr. Douglas's impression at this visit was that McQuain had spinal cord compression at C4-C5 with possible myelomalacia. R. 338. Dr. Douglas told McQuain, "I would consider doing an anterior cervical diskectomy and osteophytectomy at C4-C5 and C5-C6 with interbody grafts and anterior cervical plating." *Id.* McQuain was going to consider the procedure and call Dr. Douglas's office "if and when he want[ed] to proceed." *Id.*

At the request of his counsel, McQuain was psychologically evaluated by Tiffany Garrett, M.A., under the supervision of licensed psychologist, Michael D. Morrello, M.S., on June 4, 2013. R. 382–89. Ms. Garrett administered the Wechsler Adult Intelligence Scale-Revision IV, Wide Range Achievement Test-Revision Four, Pain Patient Profile 3, Beck Depression Inventory-Revision Two, Beck Anxiety Inventory, and Bender Visual Motor Gestalt Test. *Id.* Ms. Garrett found that McQuain's full scale IQ was 75, and she placed his cognitive functioning within the Borderline range. R. 385; 388. She also noted that the "anxious and depressive symptoms" McQuain reported having were within the minimal range and consistent with chronic pain syndrome. *Id.* Ms. Garrett also noted that McQuain had no indication of brain damage. *Id.* Ms. Garrett assessed McQuain as having a General Assessment of Functioning ("GAF") score of 56. *Id.* Finally, Ms. Garret also filled out a mental RFC assessment, finding that McQuain had moderate to marked limitations in his work-related abilities. R. 391–94.

On July 23, 2013, Dr. Whitehair completed a questionnaire from McQuain's counsel regarding McQuain's medical condition and general physical abilities. R. 431–39. In the questionnaire, Dr. Whitehair indicated that she had been treating McQuain over the preceding four year period, with the most recent examination on March 4, 2013. R. 432. Dr. Whitehair also responded that McQuain would be expected to experience chronic mild pain while working, but, for up to a third of an eight hour work day, he could climb, balance, stoop, kneel, crouch, crawl, squat, and reach. R. 437. Moreover, the doctor responded that McQuain had neither limitations on repetitive grasping/handling, arm controls, or fine manipulation/fingering, nor loss of grip strength or numbness in either of his hands. R. 438. Dr. Whitehair also opined that McQuain was capable of performing a full-time job on a regular basis, and his combined medical impairments would not be expected to cause absences from a regular job. R. 438–39.

3. Treatment after the ALJ hearing

On October 2, 2013, McQuain was seen by Dr. Denzil W. Hawkinberry for an initial evaluation of his chronic cervical and lumbar pain. R. 459. Dr. Hawkinberry noted that McQuain had an antalgic gain, decreased range of motion in his cervical spine, bony palpation of the lumbar spine, and tenderness of the SI joint; however, he exhibited full motor strength in all extremities as well as his neck. R. 462. Finally, Dr. Hawkinberry advised McQuain to contact Dr. Douglas. *Id.*

On October 22, 2013, McQuain again followed up with Dr. Douglas, and reported that his symptoms were progressively getting worse. R. 562. Dr. Douglas recommended new MRI and CT scans of McQuain's cervical spine, and for him to reconsider allowing the doctor to perform an anterior cervical diskectomy and osteophytectomy at C4-C5 and C5-C6 with interbody grafts and anterior cervical plating. R. 563; R. 338.

McQuain revisited Dr. Douglas, who reviewed and interpreted the MRI and CT scans, on December 16, 2013. R. 564. Dr. Douglas's interpretation of McQuain's MRI and CT scans led him to conclude that McQuain had cervical spondylosis, radiculopathy, and degenerative disc disease. *Id.* After reviewing the scans, Dr. Douglas ordered a CT cervical myelogram to determine whether McQuain's C5-C6 and C6-C7 should also be included in the already recommended surgical procedure. R. 566.

On January 14, 2014, McQuain returned to Dr. Douglas, who reviewed the Cervical CT myelogram. *Id.* McQuain reported that his symptoms had again worsened since his most recent visit. *Id.* He told Dr. Douglas that he had difficulty balancing himself, and he reported recently falling down from losing his balance. *Id.* At this appointment, Dr. Douglas also noted that McQuain had left arm weakness that was "concerning." R. 568. Dr. Douglas recommended an anterior cervical diskectomy and osteophytectomy on McQuain's C4-C6, and McQuain elected to proceed with the surgery. *Id.*

On January 22, 2014, Dr. Douglas performed an anterior cervical diskectomy and osteophytectomy at C4-C5 with left C5 foraminotomy and C5-C6 with left C6 foraminotomy, and an anterior interbody fusion at C4-C5 and C5-C6 with 7 millimeters VertiGraft and anterior cervical plating from C4 to C6 with the Globus Medical/Providence system. R. 470. Dr. Douglas reported no complications during the surgery. R. 472. A post-operative review of McQuain's spine showed that there was no evidence of significant spinal stenosis, and the previously seen disc herniation at C4-C5 was no longer identified; however, moderate osteophytes with mild foraminal narrowing was discovered at C6-C7. R. 482.

About three weeks later, on February 10, 2014, McQuain was seen by Dr. Douglas at a

follow up appointment. R. 574. McQuain reported some lower cervical spine pain, but he reported that his radicular pain and paresthesias had improved. *Id.* Dr. Douglas also reviewed diagnostic images that showed the "instrumentation was in good position." *Id.*

On February 20, 2014, McQuain was seen by Dr. Hawkinberry for a follow up on his "chronic cervical pain." R. 508. Dr. Hawkinberry noted that McQuain recently had surgery "that went well" and only some "residual numbness and discomfort" remained; however, it had been "less than 30 days post op and this is not unexpected." *Id.*

On March 10, 2014, McQuain returned to Dr. Douglas for another surgical follow up visit. R. 576. At this appointment McQuain again reported the same improvements and "some lower cervical spine pain" as he had reported at the prior visit. *Id.* Dr. Douglas also noted that McQuain was "doing reasonably well" and took off his cervical collar. *Id.*

On April 21, 2014, McQuain returned for another follow up appointment. R. 579. Dr. Douglas noted that McQuain reported that he "has no cervical pain but has been having some interscapular pain since surgery and some left mid biceps occasional pain and numbness." *Id.* McQuain had also developed a hoarse voice, and reported difficulty swallowing some foods. *Id.* Dr. Douglas also noted that McQuain was not participating in physical therapy or pain management. *Id.*

## C. Testimonial Evidence

Testimony was taken at the ALJ hearing held on July 30, 2013. R. 582–648. The following portions of the testimony are relevant to the disposition of this case.

### 1. McQuain's Testimony

McQuain testified that he was married, and lived with his wife and three children. R. 590–92. He stated that he had a valid drivers license and drives about once a week. R. 594. He testified that

he graduated from high school and had some training in welding. R. 595. McQuain also stated that he was employed as a mechanic for around ten years. R. 596. As a mechanic, he said that he changed hub assemblies, motors, breaks, belts, and tires, as well as performed tune-ups. R. 596; 601.

McQuain claimed that he had applied for jobs at various stores, but all the jobs he could find required "a lot of lifting and stuff" that he could not perform. R. 602. He told the ALJ that it had been about two years since he last applied for a job. *Id.* When the ALJ asked McQuain about any physical or mental conditions that interfered with his ability to work, McQuain stated that he was applying for disability "because of the pain going down the back of [his] neck whenever [he tries] to do a job." R. 603. The ALJ then asked if there were any other conditions, and McQuain responded that he stutters a lot and people have difficulty understanding him. *Id.* When asked by his counsel to elaborate on his stuttering problem, McQuain indicated that when he starts to stutter it gives him chills in his whole body, and he would become embarased. R. 611.

McQuain also stated that it had been about two years since he had last been to physical therapy, but he was taking hydrocodone and two different muscle relaxers. R. 604–05. McQuain stated that he was able to shower and dress himself, but his children put on his socks and shoes because the pain in his neck, shoulders, and back prevented him from bending that far down. R. 605. McQuain reported that he cooked a couple times a week, washed dishes by hands three times a week, went shopping once a month, and occasionally swept and raked leaves. R. 606.

McQuain testified that he could not turn his head to the left as much as he could turn it to the right, and if he looked down for "a minute or so" then his legs would start tingling. R. 613–14. He also claimed to that moving his neck to the left, up, or down, would cause tingling in his left arm and occasionally he would lose grip in his hands. R. 614. McQuain testified that he had the same

11

problem with his legs; he would be walking along and get a tingling sensation, and then, he would just lose feeling and fall down. R. 615. McQuain claimed that he could only walk about fifty yards at a time, and he used a walking cane regularly outside of his house. R. 618. McQuain's counsel asked him to rate his pain, using a scale from one to ten, with ten being "you probably need to be in the emergency room," and McQuain testified that his pain was "around a seven" on an average day. R. 620.

Neither McQuain nor his wife worked, and their only income was from food stamps. R. 621; 590; 598. McQuain testified that he was uncomfortable in public around groups of about ten or more people, and he would not go places without his wife or older sons. R. 622–23. He reported that he was nervous about being alone because Dr. Douglas supposedly told him that "any kind of a quick jerk or anything on my neck could paralyze [him]." R. 624.

## 2. The Vocational Expert's Testimony

A VE also testified at the hearing. The VE first characterized the McQuain's past work, specifically as an auto mechanic. R. 629. The VE explained that, according to the DOT, an auto mechanic is classified as medium and skilled with an SVP of 7. R. 629. The ALJ asked the VE to

> assume a hypothetical individual the same age, education, and work experience as the claimant, who retains the capacity to perform sedentary work with a sit/stand option with allowance to alternate sitting or standing positions for up to two minutes at 30-minute intervals without going off task; who is limited to occasional posturals with no climbing of ladders, ropes, or scaffolds; who is limited to no overhead reaching bilaterally; who must avoid concentrated exposure to extreme cold and heat; concentrated exposure to wetness and humidity; concentrated exposure to excessive vibration; all exposure to unprotected heights, hazardous machinery, and commercial driving; who is limited to occupations that do not require frequent verbal communication; whose work is limited to simple, routine, and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes; who's to have no interaction with the public and only occasional interaction with coworkers and supervisors. It's my understanding such an individual would be incapable of performing the claimant's past work. Is that correct?

R. 629–30. The VE testified that the individual could not perform McQuain's past work. R. 630. However, the VE identified three unskilled and sedentary positions in the local economy that McQuain could perform. R. 630. The VE testified that the typical employer permits two 15-minute breaks and one 30-minute lunch period. R. 631. The VE stated that employers "will tolerate an individual being late for work, leave work early, or miss an entire day, and they will tolerate up to two incidents per month before the individual may experience consequences." *Id.* But, individuals who exceed two incidents per month on an ongoing basis will eventually lose their job. *Id.* Lastly, the VE stated that a typical employer would tolerate an employee being "off task up to 10 percent of a work period and still generally be able to maintain levels of productivity required by employers." *Id.* However, if an individual were regularly off task more than ten percent, he would eventually lose his job. R. 632.

McQuain's attorney also examined the VE. *Id.* McQuain's attorney asked the VE to consider that the hypothetical individual had a number of additional limitations. R. 632–38. Under these additional restraints, the VE eventually testified that the individual would not be able to do any of the three positions he had identified. *Id.*

### III. ALJ FINDINGS

In determining whether McQuain was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920. The first step in the process is determining whether a claimant is currently engaged in substantial gainful activity. §§ 404.1520(b); 416.920(b). If the claimant is not engaging in substantial gainful activity, then the second step requires the ALJ to determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. §§ 404.1520(c); 416.920(c). If the

claimant has a severe impairment or combination of impairments, then the analysis moves to the third step in the sequence, which requires the ALJ to determine whether the claimant's impairments or combination of impairments meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). §§ 404.1520(d); 416.920(d). If an impairment meets or equals a listed impairment, the claimant is disabled. *Id.* However, if the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite the limitations of his impairments. §§ 404.1520(e); 416.920(e). After determining the claimant's RFC, the ALJ must determine, at step four, whether the claimant has the RFC to perform the requirements of his past relevant work. §§ 404.1520(f); 416.920(f). If the claimant does not have the RFC to do his past relevant work, then he has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, at the final step in the process, that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experiences. §§ 404.1520(g); 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983).

Here, as a preliminary matter, the ALJ determined that McQuain met the nondisability requirements set forth in the Social Security Act through June 30, 2017. R. 17. At step one of the sequential process, the ALJ found that Grall had not engaged in substantial gainful activity since April 16, 2011. *Id.* At step two, the ALJ found that McQuain had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; obesity; anxiety disorder; depressive disorder; and borderline intellectual functioning. *Id.* At the third step, the ALJ found that none of McQuain's impairments met or medically equaled the severity of any of the impairments contained

in the Listings. R. 18. In order to consider step four of the process, the ALJ determined that, since April 16, 2011, McQuain had the following RFC:

> [A] capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except entails no climbing of ladders/ropes/scaffolds and no more than occasional performance of other postural activities; accommodates a sit/stand option with allowance to alternate sitting or standing positions for up to two minutes, at thirty minute intervals without going off-task; entails no bilateral overhead reaching; entails no concentrated exposure to temperature extremes, wet conditions, humid conditions, and excessive vibrations; entails no exposure to unprotected heights, hazardous machinery, and commercial driving; entails no frequent verbal communications; entails only simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few work place changes; and entails no interaction with the public and no more than occasional interaction with co-workers and supervisors.

R. 20. At step four, the ALJ found that McQuain was unable to perform any past relevant work. R. 32. However, at the final step, the ALJ found that, considering McQuain's "age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 33. Therefore, the ALJ concluded that McQUain had not been disabled since April 16, 2011, the date last insured.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

In his motion for summary judgement, McQuain argues (1) that the "Appeals Council improperly rejected new and material evidence" and (2) that the ALJ erred in making his decision. *See* ECF No. 9-1. McQuain first argues that the Appeals Council improperly rejected new and material evidence of subsequent treatment and surgery after the ALJ hearing. *Id.* at 4–8. The evidence presented showed that McQuain had surgery on January 22, 2014, and he visited a new pain clinic for approximately five months. *Id.* McQuain concludes that reversal is warranted because the Appeals Council committed legal error when it did not find that the evidence related to the

period before the ALJ's decision. *Id.* at 8. Moreover, he asserts that this evidence "contradicts the ALJ's finding that Claimant had overstated the severity of his physical conditions." *Id.*

Second, McQuain asserts that the ALJ erred in making his findings. McQuain raises three different errors the ALJ allegedly committed in making his findings. *Id.* at 8–15. McQuain first claims that the ALJ erred by ignoring historical evidence of progressive neck and upper extremity dysfunction. *Id.* at 8. Because the ALJ ignored this evidence, McQuain contends that the ALJ's RFC lacks substantial support. *Id.* Next, McQuain argues that the ALJ failed to resolve conflicts between the VE's testimony and the DOT and SCO, pursuant to SSR 00-4p. *Id.* at 11. McQuain's final contention is that the surveillance system monitor job identified by the VE did not fit the RFC and "required reasoning and language levels above those of the Plaintiff." *Id.* at 13.

In her Motion for Summary Judgement, the Commissioner argues that substantial evidence supports the ALJ's decision, and the Appeals Council correctly denied McQuain's request for review. ECF No. 15. Specifically, the Commissioner asserts that McQuain's medical records clearly support the RFC articulated by the ALJ, and McQuain's arguments regarding any conflict between the VE's testimony and the DOT are legally incorrect. *Id.* at 16–20. Commissioner also argues that the evidence McQuain offered to the Appeals Council was neither new nor material, and that "remand for consideration of this evidence would serve no useful purpose, as the ALJ's conclusion . . . would remain the same." *Id.* at 25.

**B. The Standards**

1. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party

seeking summary judgment bears the initial burden of showing the absence of any issues of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the

light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for

summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 256 (1986).

## 2. Judicial Review

This Court's review of the ALJ's decision is limited to determining whether the decision is

supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is

"more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v.

Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable

amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Richardson v. Perales*, 402

U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but

whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v.

Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C.

§§ 405(g), 1383(c)(3).

## 3. Claimant's Credibility

"Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)). "We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

## C. Discussion

In review of the Plaintiff's Motion, it appears that he raises two general errors for this Court to consider. First, McQuain alleges that the ALJ's decision is not supported by substantial evidence. Second, McQuain claims that he presented new and material evidence to the Appeals Council, and it improperly denied his request for review of the ALJ's decision in light of this evidence.

### 1. The ALJ's Decision

In his motion for summary judgement, McQuain makes three distinct arguments that the ALJ's decision is not supported by substantial evidence. ECF No. 9-1, at 8–15.

### (a) *McQuain argues that the RFC should have included neck and upper extremity limitations*

More specifically, McQuain asserts that the ALJ "ignored historical evidence . . . of progressive neck and upper extremity dysfunction . . . ." *Id.* at 8. By supposedly failing to account for this evidence, McQuain argues that the ALJ's RFC lacks substantial support. *Id.* at 8. However, this simply is not the case.

Here, the ALJ authored an extensive and detailed decision regarding his determination of McQuain's RFC. *See* R. 20–32. As discussed above, an ALJ's credibility determinations will not be reversed unless it is shown to be "patently wrong." *Powers*, 207 F.3d at 435. Early in his findings,

the ALJ stated that we was "convinced that the claimant has overstated the severity of his physical conditions for many reasons." R. 21. Most notably, the ALJ found that McQuain's treatment history "fails to demonstrate the presence of totally disabling conditions rendering the claimant unable to engage in substantial gainful activity for a continuous period of 12 months." *Id.* The ALJ then offered a detailed explanation for his conclusion by supporting it with McQuain's medical records. *Id.*

Regarding McQuain's argument for including neck and upper extremity limitations in his RFC, the ALJ explained why he did not: the claimant's own treating source "reported that the claimant achieved a baseline as to his neck pain" on January 10, and March 4, 2013. *Id.* McQuain's records also indicated that he exhibited a "normal range of motion of extremities" and "did not have to utilize his pain medication often." *Id.*

The ALJ also noted that McQuain reported doing activities that demonstrated "greater physical capabilities than alleged." *Id.* The ALJ noted that during the relevant period, McQuain reported doing mechanic work for four hours and "assisting with some welding" on another occasion. *Id.* On January 10, 2013, McQuain indicated that "sometimes after engaging in mechanic's work, he more often will have to use pain medication." *Id.* Accordingly, the ALJ's determination not to include neck and upper extremity limitations in the RFC is supported by substantial evidence.

(b) *The ALJ improperly relied on VE testimony in conflict with the DOT and SCO*

McQuain argues that the "ALJ failed to comply with the Commissioner's ruling SSR 00-4p" by relying on VE testimony that conflicts the DOT and SCO without resolving the conflicts. ECF No. 9-1 at 11. At the hearing, the VE "identified three jobs, two of which were *Ampoule Sealer*[] and *Document Preparer*." *Id.* at 12. According to the SCO, both jobs require frequent reaching in

all directions. ECF No. 9-2. Because the RFC included "no bilateral overhead reaching," McQuain reasons that the VE's testimony conflicted with the DOT and SCO. ECF No. 9-1 at 12. McQuain further contends that the ALJ had an affirmative duty to "identify and obtain a reasonable explanation for any conflicts between the [VE and the DOT.]"

The Court agrees with Commissioner that "Plaintiff places far too much emphasis on [the DOT]." ECF No. 15 at 16. The Eighth Circuit best explained why the argument McQuain has made fails. *See Wheeler v. Apfel*, 224 F.3d 891 (8th Cir. 2000). In that case, "Wheeler argue[d] that the proposed jobs, as defined in the DOT, are inconsistent with her residual functional capacity and limitations." *Id.* at 897. But the Court held that "Wheeler's 'reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.'" *Id.* (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Moreover, SSR 00-4p, the regulation McQuain cites, explains that a VE "may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p at *3. McQuain has misinterpreted the burden SSR 00-4p places on the ALJ. The ALJ's affirmative responsibility is only "to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." *Id.* Furthermore, SSR 00-4p explains that the ALJ will "[a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT;" and if it does, the ALJ will obtain a reasonable explanation. *Id.* at *4.

The ALJ did both of these at McQuain's hearing. After the he finished questioning the VE, the ALJ asked the following question: "Has all your testimony today been consistent with and according to your experience and the DOT?" R. 632. The VE responded,

Yes, your honor, with the exception of the sit/stand option posed in the hypothetical. A sit/stand option -- my opinion regarding the need for sit/stand option and its impact on performing a job is based on my having performed a job myself or my having formally analyzed the requirements of doing a job or jobs in performing job analyses, of my having become familiar with how a job is performed otherwise.

*Id.* As the Commissioner argues in her Motion, the Fourth Circuit has explained that "an ALJ is only obligated to 'address evident discrepancies between a vocational expert's testimony and the [DOT],' rather than 'uncover such discrepancies.'" ECF No. 15 at 17–18 (quoting *Justin v. Massanari*, 20 F. App'x 158, 160 (4th Cir. 2001)).

Moreover, SSR 0-4p "does not require an ALJ to 'conduct an independent investigation into the testimony of witnesses' nor is an ALJ required to explain how a conflict was resolved if 'the plaintiff did not bring the vocational expert's mistake to the ALJ's attention.'" *Smith v. Colvin*, Civil Action No. 3:13–CV–17, 2013 WL 5966427 (N.D. W.Va. Nov. 8, 2013)(citing *Boggs v. Astrue*, Civil Action No. 2:12–CV–25, 2012 WL 5494566). In *Smith*, this Court, and the District Court, found that "the ALJ fully complied with SSR 00-4p's requirements." *Id.*

Here, McQuain's attorney was present and asked many questions at the hearing. *See* R. 583–648. In fact, McQuain's attorney began questioning the VE immediately after the exchange quoted above, yet neither she nor McQuain raised any issue regarding the VE's testimony conflicting with the DOT or SCO. *See Id.* at 632–48. Therefore, this Court finds that the ALJ acted in compliance with SSR 00-4p.

(c) *The ALJ's decision conflicted with regulations regarding the surveillance system monitor job*

To the extent that McQuain's argument concerns the VE's testimony conflicting with the DOT and SCO, the Court's reasoning in the preceding section applies, and McQuain's argument is therefore dismissed without merit. *See* ECF No. 9-1 at 13–15.

McQuain also appears to argue that as a special education student in grade school who recently tested as having a full scale IQ of 75, he is not able to meet the reasoning and language development requirements of the surveillance system monitor. *Id.*

The ALJ clearly considered McQuain's mental health impairments seriously, as evidenced by his disagreement with the State Agency Psychological Consultant, Karl Hursey, Ph. D. R. 30. In fact, the ALJ "found the claimant to have severe mental impairments, and [] appropriately accommodated for them in the above RFC." *Id.* The ALJ noted that he "fully considered all opinions of record." *Id.* McQuain was given "a GAF score of 56, which is suggestive of at most moderate social/occupational dysfunction." *Id.* The ALJ explained that he "found such moderate limitations to be appropriate." *Id.* Based on the record, this Court finds that the ALJ's determinations about the RFC and McQuain's ability to perform the surveillance system monitor job are supported by substantial evidence.

2. The Appeals Council's denial of McQuain's request for review

Finally, McQuain argues that the Appeals Council "improperly rejected new and material evidence" when it denied his request for review. ECF No. 9-1 at 4–8. McQuain presented the Appeals Council with evidence that, since the ALJ hearing, his condition had worsened and he had undergone surgery. *Id.*

"The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision." *McCormick v. Colvin*, No. 7:13–CV–00234–RJ, 2015 WL 1471269 (E.D.N.C. March 31, 2015) (quoting 20 C.F.R. § 404.976(b)(1)). New evidence "is not duplicative or cumulative." *Id.* Evidence is "material if there

is a 'reasonable possibility that the new evidence would have changed the outcome of the case." *Id.* (quoting *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991)). However, "[t]he Appeals Council need not, however, review nor consider new evidence that relates only to a time period after the ALJ issues her decision." *Id.* (citing 20 C.F.R. § 416.1476(b)(1). Finally, "the Appeals Council does not need to explain its reason for denying review of an ALJ's decision." *Id.*; *See also* Meyer v. Astrue, 662 F.3d 700, 702 (4th Cir. 2011).

(a) *McQuain's surgery*

On January 22, 2014, McQuain underwent surgery on his cervical spine. R. 470–506. McQuain argues that having surgery undermines the ALJ's determination that McQuain was overstating his condition. *See* ECF No. 9-1 at 4–8. McQuain is incorrect. Although the surgery itself is indeed evidence that relates to his condition during the relevant period, it is not actually *new*. Prior to the ALJ hearing, Dr. Douglas had already recommended this exact surgery to McQuain. R. 21, 27, 28. The ALJ took into his consideration Dr. Douglas's recommendation. *Id.*

Even if the surgery were *new* evidence, it certainly is not *material*. As the Commissioner points out in her Motion, McQuain's surgery was a success. ECF No. 15 at 25. McQuain reported that his pain was reduced and his doctor found him to be doing "reasonably well." R. 482–83, 574, 577. Unlike McQuain's contention, getting the surgery, in and of itself, does not conflict with the ALJ's determination that McQuain was overstating his condition. This Court gives the ALJ his due deference regarding credibility determinations because he "singularly had the opportunity to review the entire longitudinal record and to hear and observe the claimant's demeanor and sworn testimony at a hearing." R. 32. Thus, the Court finds no error in the Appeals Council's decision not to review McQuain's case because he had surgery after the ALJ hearing.

(b) *McQuain's post-ALJ hearing medical records*

It appears McQuain argues that medical records after the ALJ hearing show that his condition had worsened, that they relate back to his initial condition, that they are new and material, and that they contradict the ALJ's "finding that Claimant had overstated the severity of his physical conditions." As the Court has noted above, the ALJ's findings regarding McQuain, his credibility, and the RFC are all supported by substantial evidence, and these records do not conflict with the ALJ's findings.

In regard to whether the Appeals Council was within its authority to deny McQuain's case review, the Sixth Circuit has best articulated this Court's position:

> The [claimant] has further contended that the proffered medical evidence was material because it demonstrated that his condition was progressively deteriorating. It is not clear that the presented medical evidence would have supported that conclusion, but even if the contention was assumed to be correct, it would nevertheless have been an insufficient reason for remanding this claim. Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began. Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition. If in fact the claimant's condition had seriously degenerated, the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment.

Sizemore v. Sec'y of Health & Human Servs., 865 F.2d 709, 712 (6th Cir. 1988) (internal quotations omitted). Therefore, after considering all of McQuain's arguments and evidence, this Court finds that the ALJ's decision is supported by substantial evidence and the Appeals Council acted appropriately in denying McQuain's request for review.

## V. RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.    Plaintiff's Motion for Summary Judgment be **DENIED**. ECF No. 9.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** (ECF No. 14) for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: September 9, 2015                    /s/ *James E. Seibert*
                                           JAMES E. SEIBERT
                                           UNITED STATES MAGISTRATE JUDGE